UNITED STATES of America,
Appellant,

v.

Robert James MAKER, a/k/a Robert Maker, a/k/a R.J. Mahar; Constance Bridget Sullivan, Appellees.

Nos. 83–5806, 83–5862.

United States Court of Appeals,
Third Circuit.

Argued June 7, 1984.

Decided Dec. 28, 1984.

eleventh hour to seek an expedited adjudication of their claims are ill-situated to complain.

J. Alan Johnson, U.S. Atty., Paul J. Brysh (Argued) Asst. U.S. Atty., Pittsburgh, Pa., for appellant.

Thomas A. Livingston (argued), Livingston, Miller, O'Malley & Clark, Pittsburgh, Pa., for appellee Maker.

John L. Doherty (argued), Manifesto & Doherty, P.C., Pittsburgh, Pa., for appellee Sullivan.

Before WEIS and BECKER, Circuit Judges and ACKERMAN, District Judge.*

* Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey,

## OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal by the government pursuant to 18 U.S.C. § 3731 (1982) from the dismissal of a mail fraud indictment presents difficult questions regarding the interpretation of the double jeopardy clause of the fifth amendment. It also requires us to consider the elements necessary for proof of a single scheme to defraud.

The indictment charged the defendants, Robert James Maker and Constance B. Sullivan, with a single scheme to defraud in connection with insurance claims arising out of two motor-vehicle accidents in which Maker was involved. *See* 18 U.S.C. § 1341 (1982). After the jury was sworn and proceedings were commenced, the district court ordered separate trials with respect to the counts arising from each scheme, and also ordered separate trials for each defendant. Subsequently, relying on *United States v. Camiel*, 689 F.2d 31 (3d Cir. 1981), the court dismissed the indictment, holding that the evidence could not support an indictment based on only a single scheme, but rather that a separate scheme arose from each accident.

The defendants seek to uphold the district court's order of dismissal and argue preliminarily that this appeal, which seeks a reinstatement of the indictment and consequent trial thereon, is barred by the double jeopardy clause. Notwithstanding the fact that the indictment was dismissed after a jury was impanelled, we conclude that the double jeopardy clause does not bar this appeal, and that, if the government is able to prove the allegations in the indictment, such evidence would be sufficient to support a conviction based on a single scheme. We therefore reverse the judgment of the district court and remand the case for trial. We then consider whether the district court abused its discretion in ordering separate trials. Given our conclusion that the district court erred in determining that the allegations of the indict-

sitting by designation.

ment necessarily involved two separate "schemes," we hold that the court abused its discretion in ordering separate trials on the counts arising from each accident. Finally, we conclude that the district court did not abuse its discretion in ordering separate trials for the two defendants.

Resolution of the legal issues presented in this case requires that we first describe in some detail the allegations of the indictment.

## I. *THE INDICTMENT*

The defendants were named in an indictment charging eighteen counts of mail fraud in furtherance of a single scheme to defraud. According to the indictment, the scheme began when Maker was involved in a motor-vehicle accident on March 25, 1976, and continued after he was involved in a second accident on August 14, 1977.[1] Neither of the accidents was staged; rather, Maker simply sought to turn them to his account. Generally, the indictment alleges that Maker carried out this scheme by providing three different insurance companies with false information: first, that he had been employed as a boilermaker until each accident rendered him unable to continue that work; and, second, that he did not pursue any other work during the time he was receiving wage-loss benefits from the three companies.[2] We turn to the specifics.

### A. *The Royal Globe Policy Claims*

On April 27, 1976, Maker applied for benefits, including wage-loss benefits, in connection with the March 25, 1976, accident, from the Royal Globe Insurance Company.[3] Maker stated that, prior to the accident, he had been earning an average of $400 a week as a journeyman with the Boilermakers Local 154 working out of

Pittsburgh. The indictment alleges, however, that Maker had actually been living in Florida for over a year before the accident and had received no income from employment out of Local 154 for that period. Maker received wage-loss benefits from Royal Globe for the period beginning on the date of his accident through July 15, 1977, at which time the maximum of $25,000 had been paid under the policy. *Id.* at 7A (¶ 9). On January 6, 1977, Maker also applied for compensation for domestic services provided by Sullivan. The indictment alleges that this claim was fraudulent because Maker was able to perform ordinary domestic chores throughout this period. *See id.* (¶ 10). The indictment also alleges that on August 9, 1977, Maker and Sullivan submitted sworn statements to Royal Globe indicating that Maker had been incapacitated from April 1976 until the date of the statement and that he had paid Sullivan $140 a week for domestic services that she had performed while Maker was injured. *Id.* at 8A (¶ 14).

Finally, the indictment alleges that on June 20, 1979, Maker sought from Royal Globe an additional $22,500 as compensation for wages lost as a result of the March 25, 1976, accident. *Id.* at 11A (¶ 27). This request was submitted to a Board of Arbitrators, which, on March 24, 1980, awarded Maker $20,000 of the requested benefits. *Id.* (¶ 29). Royal Globe paid Maker the $20,000 on April 3, 1980. *Id.* (¶ 30).

### B. *The Erie Insurance Company Policy Claims*

The indictment further alleges that, on September 13, 1977, Maker initiated legal action in the Court of Common Pleas for Allegheny County against Erie Insurance Company, the insurer of the driver of the car involved in the March 25, 1976, acci-

---

1. The final illegal act alleged in the indictment occurred on April 3, 1980. Appendix at 15A.

2. The indictment acknowledges that Maker informed the insurance companies that he had performed work as a boilermaker for several days. *See id.* at 10A (¶ 23).

3. The Royal Globe policy was issued in the name of Maker's mother; Maker's eligibility was premised on his representation that he lived with his mother at the time of the accident. *Id.* at 6A (¶ 8). The policy was issued in accordance with the Pennsylvania No-Fault Law. *See id.* at 84A.

dent.[4] *Id.* at 8A (¶ 15). On several occasions, according to the indictment, Maker supported this claim with false statements to the effect that he had been physically unable to return to work after the March 26, 1977, accident,[5] that he had resided in Pittsburgh and had been employed as a boilermaker out of Local No. 154 prior to the accident,[6] and that he had worked as a boilermaker for a total of only three days from the date of the accident until the end of March 1979.[7]

The suit against Erie concluded on March 28, 1979, when Maker was awarded $5,000. *Id.* at 10A (¶ 24). Erie then allegedly paid Maker $5,000 on June 27, 1979. *Id.* at 11A (¶ 28).

### C. *The State Farm Insurance Claims*

On April 20, 1977, Maker applied for an automobile insurance policy that included coverage for lost wages of up to $2,500 a month, with a ceiling of $50,000. *Id.* at 7A (¶ 12). When he applied for this policy, which was assigned to the State Farm Insurance Company, Maker allegedly represented that he was employed as a boilermaker with Local No. 154. *Id.*[8]

The indictment alleges that Maker filed a claim with State Farm for damages resulting from his August 14, 1977, accident. This claim, filed on October 13, 1977, stated that Maker had been earning $568 plus overtime each week before the August accident, but that he had been unable to work after the accident. *See id.* at 8A (¶ 16). State Farm acted on this claim on November 2, 1977, paying Maker for wage-loss benefits retroactive to August 15, 1977. State Farm then reimbursed Maker for his alleged wage losses at a rate of $1,087.42 every two weeks until March 19, 1979. *Id.* at 8–9A (¶ 17).[9] After State Farm terminated the wage-loss payments, Maker allegedly instructed his attorney to write letters on April 5 and 18, 1979, and May 9, 1979, to State Farm asking that the benefits be continued and stating that Maker would initiate legal action in the absence of such payments. *Id.* at 10–11A (¶ 25).

### D. *Employment as a Boilermaker*

The indictment alleges that there were four periods of time during which Maker was employed as a boilermaker at the same time that he was receiving wage-loss benefits from one or more insurance companies.[10] The first period was from April 1 to August 3, 1977, during which, the indictment alleges, Maker worked as a boilermaker for the Babcock and Wilcox Construction Company, using the name Robert Makar. *Id.* at 7A (¶ 11). This is a time period for which Maker allegedly requested and received wage-loss benefits from Royal Globe and for which Maker and Sullivan allegedly requested domestic-service reimbursements.[11]

Maker was next employed during two periods for which, according to the indict-

---

**4.** This suit was filed one month after Maker's second accident, which occurred on August 14, 1977.

**5.** This statement was made in answer to interrogatories on January 13, 1978. *See id.* at 9A (¶ 18).

**6.** These allegedly false statements were made during a deposition on February 23, 1978. *See id.* (¶ 20). The statements are virtually identical to those that accompanied Maker's claim for wage-loss benefits from Royal Globe. *See supra* page 616.

**7.** Maker allegedly made this statement at the trial against Erie on March 26 and 27, 1979. *Id.* at 10A (¶ 23).

**8.** This is the same allegedly fraudulent representation that Maker made to the Royal Globe and

Erie Insurance Companies. *See supra* note 6 and accompanying text. The State Farm policy was issued in accordance with the Pennsylvania No-Fault Law. *See id.* at 85A.

**9.** The total amount of wage-loss benefits paid out to Maker by State Farm over the approximately eighteen-month period was $44,946.72. *Id.* at 9A (¶ 17)

**10.** As is noted *infra*, Maker allegedly used a false name and social security number when he performed some of this work. The indictment alleges that he applied for a new social security number in the name of Robert James Makar on December 15, 1976. *Id.* at 6A (¶ 7).

**11.** It is less clear on the face of the indictment whether the $5,000 judgment against Erie was intended to compensate Maker for wage losses during this time period.

ment, it can be inferred that he received wage-loss benefits from two, and possibly all three, insurance companies. The indictment alleges that Maker worked for 67½ hours as a boilermaker during January 1978, again using the false name of Robert Makar. *Id.* at 9A (¶ 19). It then alleges that during May and June 1978, Maker was employed as a boilermaker by Schneider, Inc., under his real name, and by both United States Steel Corp. and Bottum, Inc., under the name Robert Makar. *Id.* at 10A (¶ 22). During these two time periods, Maker allegedly received wage-loss benefits from State Farm based on the disabling injuries caused by the second accident. One could infer from the indictment that the $20,000 paid by Royal Globe to Maker as a result of the arbitration process was intended, in part, to reimburse Maker for wage losses during these time periods. Finally, one could also infer from the indictment that part of the $5,000 judgment against Erie was intended to reimburse Maker for wage losses during these two periods. *See supra* page 617.

Finally, the indictment alleges that from April 6, 1979, to August 6, 1979, Maker worked as a boilermaker for the Babcock and Wilcox Construction Company, using a false name, and for the Simakas Brothers Construction Company, using two false names. Appendix at 11A (¶ 26). As set out above, the indictment alleges that during this same time period Maker directed his attorney to request additional wage-loss benefits from State Farm based on the second accident. Also, it was during this interval that Maker allegedly submitted the claim to Royal Globe for an additional $22,500 in wage-loss benefits based on the first accident.[12]

As the foregoing summary indicates, Maker and Sullivan were charged with defrauding three insurance companies based on two traffic accidents. The indictment specifically alleged that eighteen separate mailings, from October 1977 to April 1980, were made in pursuit of a single scheme to defraud.[13] Whether the indictment actually alleged a single scheme is a critical point that we address below.

## II. *THE PROCEEDINGS IN DISTRICT COURT*

Following the impanelling and swearing of the jury, counsel for Sullivan moved to dismiss several counts of the indictment against Sullivan on the grounds that they were based on conduct that bore no relationship to her. *See id.* at 21–22. The district court reserved judgment on the motion, and the government proceeded to make its opening statement to the jury. Based on the government's stated intention of proving its allegations by introducing transcripts of several sworn statements by Maker and Sullivan, the attorneys for each defendant requested severance so that each defendant could have an opportunity to cross-examine the other defendant about the substance of the sworn statements.[14] *See id.* at 154A (motion for severance as to Sullivan); *id.* at 155A (motion for severance as to Maker). The district court, persuaded that the question of joinder was at least troubling in light of this argument, *see id.* at 158–59A, decided to review the transcripts that the government intended to introduce at trial before deciding whether to grant a severance. *See id.* at 162A.

While arguing in favor of the motion to sever before the district court, Maker's counsel also requested that there be two trials for each defendant: one trial to consider each defendant's culpability regarding claims arising from the March 1976 accident and the other trial to consider each defendant's culpability regarding claims arising from the August 1977 accident.

---

**12.** This was the claim that resulted in the $20,000 arbitration award of March 24, 1980.

**13.** At trial, the court dismissed two of these eighteen counts (specifically counts 4 and 6) at the request of the government. *Id.* at 68A.

**14.** Counsel for Sullivan also specifically objected that she would be substantially prejudiced by evidence admitted to prove the complicity of Maker. *See, e.g., id.* at 94–95A, 100A.

*See, e.g., id.* at 165A.[15] Although the district court initially responded to this request for severance by noting that the accidents might have been sufficiently related because the second accident had aggravated physical injuries caused by the first, *see id.* at 166–67A, the court nevertheless remained concerned about whether the accidents were, in fact, sufficiently related. *See id.* at 170A.

With these two motions before it, the district court reviewed several transcripts relating to Maker's civil proceedings [16] that the government intended to present at trial. Following this review, the court expressed great concern about the joinder for trial purposes of the defendants and of the accidents. *See id.* at 174A, 185–86A. Regarding joinder of the defendants, the court concluded that admitting the transcripts into evidence in a joint trial would preclude each defendant from having an opportunity to confront the other about his or her statements. *See id.* at 180–82A. Regarding joinder of the accidents, the court came to two related and important conclusions, one legal and the other apparently factual. First, it decided that, to sustain a conviction for the alleged single scheme to defraud, the government was required to prove that the entire scheme had been planned in advance by the defendant, meaning that, in this case, the government had to prove that Maker had planned the second accident and had intentionally

caused it. *See id.* at 190A, 191–92A ("it's impossible, just totally impossible for you to tell me that he planned to bilk Global [sic], Erie and State Farm back in 1976, before the two accidents happened").[17] The court then decided, based on its reading of the indictment and transcripts, that the government did not have evidence sufficient to prove this element of its case. *Id.* at 192A. Based on these conclusions, the district court granted the defendants' motion to sever the trial as to both the defendants and the accidents.[18] *Id.* at 283A.

The district court then ordered that the trial already under way proceed with only Maker continuing as a defendant and with only evidence and counts related to the April 1976 accident being considered. The government proceeded to call its first witness and following that testimony the trial was adjourned for the weekend. When the court reconvened on Monday, counsel for Maker brought to its attention this court's opinion in *United States v. Camiel,* 689 F.2d 31 (3d Cir.1982), which had established that a defendant cannot be tried for multiple schemes to defraud on an indictment charging a single scheme.[19] The district court reiterated its view that the government's allegations could not support a single scheme indictment. The court then ruled that, under *Camiel,* this defect in the indictment could not be cured by severing

---

15. Maker's attorney had earlier argued in this regard that each of the accidents was independent of the other and that one indictment must not present a range of counts with some related to one and some to the other accident, just as one indictment could not rely on two unrelated bank robberies. *See id.* at 122A.

16. These proceedings are described *supra* at pages 616–617. The transcripts were of the following: a deposition of Maker dated February 23, 1978; testimony of Maker dated March 26 and 27, 1979; a sworn statement of Maker dated August 9, 1977; and a sworn statement of Sullivan dated August 9, 1977.

17. The court restated this proposition somewhat later in the trial in these straightforward terms: "[The second accident] *would have to be contrived* in order to be a continuous scheme." *Id.* at 244A (emphasis added).

18. The district court therefore contemplated four separate trials. *See id.* at 282–83A.

19. In *Camiel,* we concluded that, when an indictment that alleges a single scheme is based as a legal matter on two or more separate schemes:

it is the indictment itself that is fatally flawed.
Once this is recognized, the proper remedy is clear. We may identify the flaws in the current indictment but correcting those flaws is beyond our power. An indictment may not be amended, changed, or altered in any material respect except by resubmission to the grand jury.... This court can neither act for a grand jury, nor speculate whether a grand jury would have indicted the named defendants had it realized that the indictment as written was overbroad.
689 F.2d at 39 (citations omitted).

the trial as it originally had ordered. *See* Appendix at 642A.[20] The court thereupon dismissed the indictment on the motion of Maker, *id.,* but denied Maker's motion for a judgment of acquittal. *Id.* at 263A.

## III. *APPELLATE JURISDICTION*

### A.

We must first decide whether we have jurisdiction to consider this appeal. The Criminal Appeals Act, 18 U.S.C. § 3731 (1982), provides, in pertinent part:

> In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

The Supreme Court has concluded that this provision allows a government appeal of a district court order in a criminal case "unless the appeal is barred by the Constitution." *United States v. Wilson,* 420 U.S. 332, 339, 95 S.Ct. 1013, 1019, 43 L.Ed.2d 232 (1975). *See generally id.* at 337–39, 95 S.Ct. at 1018–20.

Maker contends that there can be no appeal from the district court's order dismissing the indictment because the order represents a "factual" determination, based upon counsels' opening statements and a review of some of the government's intended evidence, that the government's evidence demonstrated two schemes rather than one. According to Maker, once jeopardy has attached, an appeal from such a "factual" conclusion is barred by the double jeopardy clause of the fifth amendment.[21] The government responds that the district court dismissed the indictment as a result of an erroneous *legal* determination, and that the double jeopardy clause is, therefore, not implicated.[22]

The major policy underlying the double jeopardy clause was succinctly set out by Justice Black in *Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957):[23]

> The underlying idea, one that is deeply ingrained in at least the Anglo-American

---

**20.** The court reasoned:

> It seems that as a single scheme indictment here, seems that the case is bottomed on a multiple scheme, at least two schemes. It appears from the [*Camiel*] case that this is a defect which cannot be cured by a severance, which I had attempted, and a separate trial. It says the indictment in [*Camiel*] is out because of the prejudicial variance, and an attempt by this Court, which the Court, in fact, did make, to cure this problem by severance ..., especially when you have a situation where you have a single scheme theory with multiple schemes as a matter of fact alleged, under all these circumstances this Court has no other alternative except to dismiss this indictment ....

> Appendix at 262A.

**21.** The fifth amendment of the Constitution provides that "No person shall ... be subject for the same offence to be twice put in jeopardy of life or limb ...."

**22.** During at least one stage of the district court proceeding, the governemnt, the defendants, and the district court all apparently believed that, because the jury had been impanelled, jeopardy had attached and the government would be precluded from further prosecutions of the defendants. *See, e.g.,* Appendix at 56A (statement by the U.S. Attorney that "[p]rejudice has attached by virtue of the jury having been impanelled, we would have no right of appeal of Your Honor's order at this point in time, so I have no choice but to comply with the Court's directions."); *id.* at 184A (Court suggests that defendants delayed their motion to dismiss until after the jury had been chosen so that a new proceeding would be barred by the double jeopardy clause). Although the Supreme Court has explicitly held that "[t]he federal rule that jeopardy attaches when the jury is empanelled and sworn is an integral part of the constitutional guarantee against double jeopardy," *Crist v. Bretz,* 437 U.S. 28, 38, 98 S.Ct. 2156, 2162, 57 L.Ed.2d 24 (1978), this proposition, as we explain in the text *infra,* is the beginning rather than the end of our analysis.

**23.** One article has identified this passage as the Supreme Court's "most famous and oft quoted list of double jeopardy values." Westen & Drubel, *Toward a General Theory of Double Jeopardy,* 1978 Sup.Ct.Rev. 81, 86. As these authors point out, *id.,* the Supreme Court has also stated that the clause protects a defendant's "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

The implications of this policy, however, are not without limit. Recently the Supreme Court has focused on a set of concerns that must inform the application of the double jeopardy clause. In *Burks v. United States*, 437 U.S. 1, 15, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978), the Court stated that "society maintains a valid concern for insuring that the guilty are punished," and reiterated that " '[i]t would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.' " *Id.* (quoting *United States v. Tateo*, 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448 (1964)).

In defining the impact of the double jeopardy clause on this case, we are guided primarily by the Supreme Court's decision in *United States v. Scott*, 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978). In *Scott*, the Court considered "the relationship between the Double Jeopardy Clause and re-

prosecution of a defendant who has successfully obtained not a mistrial but a termination of the trial in his favor before any determination of factual guilt or innocence." *Id.* at 94, 98 S.Ct. at 2195.[24] The Court, relying in substantial part on the theory that the defendant "suffers no injury cognizable under the Double Jeopardy Clause" when a proceeding is terminated as a result of the deliberate choice of the defendant,[25] concluded that "where the defendant ... obtains the termination of the proceedings against him in the trial court without any finding by a court or jury as to his guilt or innocence" an appeal by the government is permitted. *Id.* at 100, 98 S.Ct. at 2198.

■ Thus, under *Scott* an appeal in this case is barred only if the issue of the defendants' guilt or innocence has been determined by the district court. *Scott* also provided the following test for deciding whether such a determination has been made: "a defendant is acquitted only when 'the ruling of the judge, whatever its label, actually represents a resolution [in the defendant's favor], correct or not, of some or all of the factual elements of the offense charged.' " *Id.* at 97, 98 S.Ct. at 2197 (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571, 97 S.Ct. 1349, 1354, 51 L.Ed.2d 642 (1977)) (brackets in original).[26]

24. The *Scott* case involved a government appeal of the dismissal of an indictment that was granted at the close of all the evidence because there had been preindictment delay.

25. This principle, a species of the doctrine of waiver, has long been considered relevant by the Supreme Court in determining the application of the double jeopardy clause. *Compare United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824) (requiring "manifest necessity" for a retrial if the defendant either did not move for or did not join in a motion for mistrial) *with United States v. Dinitz*, 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267 (1976) (when the defendant consents to a mistrial, there is no constitutional bar to retrial unless there were "governmental actions intended to provoke mistrial requests"). *Cf. United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (plurality opinion of

Harlan, J.) ("where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error"). These cases are discussed by the Court in *Scott. See* 437 U.S. at 92–94, 98–100, 98 S.Ct. at 2197–2198.

26. As the quoted language in *Scott* makes clear, the determination of whether there has been an acquittal does not turn on how the district court labels its decision. *See also United States v. Ember*, 726 F.2d 522, 524 (9th Cir.1984) ("The trial judge's characterization of his own action cannot control the classification of the action."). Thus, our decision in this case would be the same regardless of whether the trial court had, on this record, effected his decision by granting Maker's motion for a judgment of acquittal.

We believe that this language provides the crucial definition for determining whether double jeopardy bars an appeal when a proceeding is terminated on the motion of a defendant after the jury is sworn. *See, e.g., United States v. Genser,* 710 F.2d 1426, 1427–28 (10th Cir.1983); *United States v. Dahlstrum,* 655 F.2d 971, 974 (9th Cir.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982); *Hawk v. Berkemer,* 610 F.2d 445, 447 (6th Cir.1979). The Court did not, however, provide significant direction on how the test should be applied, because in *Scott* the trial court clearly had not made a factual determination.[27] As we noted earlier, *see supra* note 24, the *Scott* case was dismissed because of preindictment delay, a determination that was independent of any finding related to the culpability of the defendant. Several courts of appeals have now had opportunities to apply the *Scott* test in more difficult contexts. While none has developed a bright-line formula, these courts have generally understood the test to require an acquittal only when, in terminating the proceeding, the trial court actually resolves in favor of the defendant a factual element necessary for a criminal conviction. *See Carter v. Estelle,* 677 F.2d 427, 452–53 (5th Cir.1982) (determination by the state court of appeals of "an essential element of the offense charged" was an acquittal under Scott), *cert. denied,* 460 U.S. 1056, 103 S.Ct. 1508, 75 L.Ed.2d 937 (1983); *United States v. Dahlstrum,* 655 F.2d 971, 974 (9th Cir.1981) (although the court finds that the double jeopardy clause bars reprosecution because the defendant did not seek dismissal of the action, it also concludes that there is an acquittal under *Scott* only if "the district court's disposition *actually represented* a resolution of any of the factual elements of the offense charged" (emphasis in original)), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982); *United States v. Moore,* 613 F.2d 1029, 1037 (D.C.Cir.1979) (there is no acquittal under *Scott* "unless, in ruling on the applicability of the defense, the District Court somehow reached a resolution of one or more of the elements of the offense with which he is charged"), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2922, 64 L.Ed.2d 811 (1980); *Sedgwick v. Superior Court for the District of Columbia,* 584 F.2d 1044, 1049 (D.C.Cir.1978) (*Scott* "does not bar government appeal and retrial unless [a dismissal] is premised on some *factual* determination of the insufficiency of evidence of defendant's guilt" (emphasis in original)), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 849, 59 L.Ed.2d 42 (1979). *Cf. Wilkett v. United States,* 655 F.2d 1007, 1012 (10th Cir.1981) (there was no acquittal under *Scott* when the trial was terminated because the government "failed to prove an element which is more procedural than substantive, namely, venue"), *cert. denied sub nom. Conklin v. United States,* 454 U.S. 1142, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982).[28]

## B.

To determine whether *Scott* allows an appeal by the government in this case, we

---

**27.** One commentator has written that *"Scott* bars appeal of midtrial dismissals based on factual grounds but not those based on legal grounds. It provides little guidance, however, as to how this distinction should be drawn." Comment, *Double Jeopardy and Appeal of Dismissals: A Before and After Approach,* 69 Calif. L.Rev. 863, 876 (1981) (footnote omitted).

**28.** In the wake of these cases, it remains unclear whether the *Scott* test for an acquittal requires that a determination by the district court made after significant testimony is heard be considered either a *per se* or a presumptive finding of fact. As the authors of one article suggest, determining whether a trial court's decision is fact-based or law-based becomes more difficult as a trial progresses, because any decision by the court will be increasingly likely to be affected by its assessment of witnesses' credibility and its overall impression of the case. *See* Westen & Drubel, *supra* note 23, at 152–54. *See also United States v. Ember,* 726 F.2d 522, 524 & n. 4 (9th Cir.1984) (finding that the district court had resolved "factual elements" because it "commented that the government had a weak case, had presented it poorly, and had done a poor job of preserving the evidence"). Because the district court in this case made its determination based only on the government's opening statement and the court's review of certain transcripts, and appears otherwise to be based essentially on legal grounds, we need not resolve this issue.

consider whether the district court resolved in Maker's favor "an essential element of the offense charged." *Carter*, 677 F.2d at 452–53. The district court dismissed the indictments because it concluded that the government had not alleged facts sufficient to prove all of the legal elements that it believed were necessary to sustain a conviction on a charge of a single scheme to defraud.[29] Specifically, the court concluded as a legal matter that a single scheme conviction requires proof that the defendant had planned the scheme in its major details before any aspect of the scheme is implemented. The court then made what is, at least arguably, a factual determination,[30] based on its reading of the civil proceeding transcripts, the indictment, and the opening statements, that the government could not prove that Maker had intentionally planned and then caused the second accident.[31]

■ The government's appeal in this case is barred only if the district court's legal determination about the elements of a single scheme conviction is correct. We are, however, unable to find in the cases any requirement that a conviction for a single scheme to defraud must rest on a showing that the entire scheme was planned at the outset or, to state the requirement in other words, that the scope of a mail-fraud scheme is determined by the

defendant's state of mind at the time of the initial alleged incident of mail fraud. We are also unwilling to establish such a requirement, because it would unnecessarily distract a court from the factors that we believe are fundamental to a determination of whether a scheme is ongoing and unified. As we explain further in section IV, these factors include the identity of the defendants and the similarities in the allegedly fraudulent conduct. Therefore, the district court's arguable factual finding did not actually determine in Maker's favor any of the essential elements of the crime with which he was charged.

We do not mean to suggest, of course, that, if the government were able to prove that Maker either planned or intentionally caused the second accident, such evidence would be irrelevant to the issue of whether a single scheme existed. Such evidence might, in fact, be *sufficient* to prove the existence of a single scheme, but such evidence is in no way *necessary* to secure a conviction. Thus, this case is not unlike *United States v. Moore*, 613 F.2d 1029 (D.C.Cir.1979), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2922, 64 L.Ed.2d 811 (1980). In *Moore*, the court allowed the government's appeal despite the fact that, in dismissing the case, the district court determined facts that were relevant to, but not decisive of, one element of the crime.[32] The district

29. The district court's analysis in this regard is set out in detail *supra* at note 17 and accompanying text.

30. Because we conclude that any factual determination made by the district court in this case did not resolve an essential element of the offense, we need not decide whether that determination was itself legal in character because it was based merely on the district court's assessment of *allegata*, rather than on an assessment of *probata*.

31. These determinations are also outlined *supra* at pages 619–620 in our discussion of the district court proceedings.

32. In *United States v. Moore*, 613 F.2d 1029 (D.C.Cir.1979), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2922, 64 L.Ed.2d 811 (1980), the court considered whether the government could appeal an order dismissing an indictment after an "evidentiary-type proceeding" in a bench trial.

*Id.* at 1033. Moore had been charged with knowingly making false declarations before a grand jury in violation of 18 U.S.C. § 1623(a). A conviction for false declarations requries that the individual "in any proceeding before [a] ... grand jury ... knowingly make[ ] any false material declaration," 18 U.S.C. § 1623(a) (1982), and Moore had conceded that he had knowingly made the false statements. 613 F.2d at 1037. Thus, the sole issue at the bench trial was whether his declarations were material. *See id.* at 1034–35. The court had before it the testimony of the deputy foreman of the grand jury, "whose testimony went exclusively to the issue of materiality." *Id.* at 1033.

The district court found that Moore's false statements had not had a substantial effect on the grand jury proceeding, and accordingly the court dismissed the indictment holding that "[Moore] must be afforded the opportunity to recant his prior statement," *id.* at 1037, by availing himself of the recantation defense estab-

court's dismissal of the indictment is therefore not an acquittal under the teaching of *Scott,* and the government's appeal of the dismissal is not barred.

Our conclusion that an appeal is not barred in this case is consistent with the policies underlying the double jeopardy clause. This is not a case in which a second trial is permitted "for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978). Instead, this is a case in which the district court, as the result of a legal error, determined that the government could not prove a fact that is not necessary to support a conviction. To preclude an appeal in this case would deprive the public "of its valued right to 'one complete opportunity to convict those who have violated its laws.'" *Scott,* 437 U.S. at 100, 98 S.Ct. at 2198 (quoting *Arizona v. Washington,* 434 U.S. 497, 509, 98 S.Ct. 824, 832, 54 L.Ed.2d 717 (1975)).

## IV. *THE SUFFICIENCY OF THE INDICTMENT*

■ Having concluded that the double jeopardy clause does not bar the government's appeal in this case, we consider whether the district court erred when it dismissed the indictment against Maker

and Sullivan because of a prejudicial variance. Such a dismissal is necessary when (1) there is a variance between the indictment and the proof and (2) the variance, if any, prejudices some substantial right of the defendant. *See United States v. Camiel,* 689 F.2d 31, 35 (3d Cir.1982).[33]

Our initial inquiry into whether variance exists is intended to protect the right of each defendant not to be tried for the conglomeration of distinct and separate offenses. *See Kotteakos v. United States,* 328 U.S. 750, 775, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946). In *Camiel,* we considered in detail whether, on the evidence presented by the government, there had been one single scheme to defraud, or more than one independent scheme. We established, first, the general proposition that "the federal mail fraud statute requires only that the co-schemers participate in a common scheme. Thus, it is the existence of a common scheme, and not any agreement among the parties to participate in it, that is critical." *Camiel,* 689 F.2d at 36. Because of the specific facts of the case, however, we focused primarily on the factors that *militated against* finding a common scheme. We decided that a conclusion that a common scheme existed was substantially undermined because two individuals, who were actively hostile to each other, had acted in the organizational capacity that was considered the "key" to the al-

---

lished by 18 U.S.C. § 1623(d). Moore, in fact, had offered before the trial to appear before the grand jury and recant his statement, but the government rejected that offer because it did not deem the new facts to be credible. *See id.* at 1032–33.

In deciding whether the appeal was barred under *Scott,* the court of appeals determined that, as a legal matter, "a finding of no substantial effect [for purposes of applying the recantation provision] is not the equivalent of a ruling for the defendant on the issue of materiality [for purposes of the substantive offense]." 613 F.2d at 1038–39. Thus, despite the fact that the district court had made a factual determination as to the effect of Moore's false statement on the grand jury proceeding, the court of appeals held that *Scott* did not bar the government's appeal. In reaching this decision the court concluded, as a matter of law, that:

false testimony that has not had a substantial effect for purposes of [the applicability of the recantation defense] may still be material in the Section 1623(a) sense. Consequently, the District Court's ruling that Moore's false statements did not have a substantial effect on the grand jury proceeding did not resolve in his favor any of the factual elements of the offense of false declarations.

*Id.* at 1038 (footnote omitted). Our approach in this case is similar.

**33.** In *Camiel,* the government appealed a judgment of acquittal that the district court entered following a jury verdict of guilty. *See* 689 F.2d at 34–35. We concluded that because the defendants had been prejudiced by the variance between the indictment and proof the district court had acted properly when it entered its judgment of acquittal.

leged scheme. *Id.*[34] We also searched in vain for evidence "that could link the relevant activities into a common scheme." *Id.* Despite the government's claim that the disparate activities were "weld[ed]" into a common scheme because one organization (i.e., the City Committee) had employed the two "key" figures in the same position, we considered this link legally insufficient to make out a common scheme because the unlawful conduct was not intended to further the Committee's institutional purposes. *Id.* Accordingly, we affirmed the district court's judgment of acquittal. *Camiel,* therefore, teaches that in evaluating whether one scheme has been alleged or proved, a court should focus on the identity of the actors and the overall purpose of their conduct.

More recently, in *United States v. DiPasquale,* 740 F.2d 1282 (3d Cir.1984), we considered whether an indictment that alleged a single conspiracy was actually based on at least two separate conspiracies.[35] We concluded that "evidence [of the similarity of method and result, and the partial overlap of participants, in the various incidents] is probative of a unitary conspiracy." *Id.* at 1290.[36] These elements of a single scheme are wholly consistent with those identified by the Fifth Circuit in *United States v. Rodgers,* 624 F.2d 1303 (5th Cir.1980), *cert. denied sub nom. Anthony J. Bertucci Construction Co. v. United States,* 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981). In *Rodg-*

ers, the court concluded that a single scheme was proved when the evidence showed "a common goal, operations carried out in virtually identical manner, and an overlapping of participants.... The presence of these factors is more than sufficient to refute defendants' argument of a prejudicial variance." *Id.* at 1307 (citation omitted).

■ With these factors in mind,[37] we turn to the allegations presented by the government in this case. We consider first "the similarity of [both] method and result" in regard to the alleged scheme. *DiPasquale,* 740 F.2d at 1290. The government alleges that the co-defendants intended to defraud three insurance companies by misrepresenting the nature of the damages caused by two automobile accidents.[38] We discern in the allegations several important similarities in how the co-defendants sought to realize their intentions. First, the government alleges that Maker made the same fraudulent representation about his employment history just prior to the accidents to each of the three insurance companies in his attempt to secure wage-loss benefits. *See supra* note 8 and accompanying text. The government also alleges that Maker was employed as a boilermaker for three periods of time during which one could conclude that he received wage-loss benefits from either two or three of the insurance companies based on fraudulent claims. Finally, the government alleges that Maker used more than one false name

---

34. The "key-person" in the scheme was the chairman of a city political committee. *Id.* at 36.

35. *Camiel* had established that the factors that determine whether a single conspiracy is present are identical to those that determine whether a single scheme is present. *See id.* at 35.

36. In *DiPasquale* we also noted that a single scheme is indicated when the activities "demonstrate[ ] 'a continuity of purpose and a continued performance of acts.'" 740 F.2d at 1290 (quoting *United States v. Mayes,* 512 F.2d 637, 642 (6th Cir.), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670, 423 U.S. 840, 96 S.Ct. 69, 46 L.Ed.2d 59 (1975)).

37. We emphasize that the *Camiel, DiPasquale,* and *Rodgers* decisions did not suggest in any way that a single scheme could be proved only when the government demonstrated that the participants had planned all of the allegedly fraudulent activities from the outset.

38. Certainly the fact that more than one insurance company was allegedly victimized does not undercut the existence of single scheme to defraud, when the method and result of the victimization were the same. *See, e.g., United States v. Lebovitz,* 669 F.2d 894, 897–99 (3d Cir.) (mailings sent to two different insurance companies were sufficiently related to support a conviction for a single scheme to defraud), *cert. denied,* 456 U.S. 929, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982).

and social security number in connection with these jobs, apparently to conceal his employment from the three allegedly defrauded companies.[39] We believe that these three allegations, when considered together, are sufficient indicia of the common purpose and method that are elements of a single scheme to defraud.

The third factor discussed in *Camiel, DiPasquale,* and *Rodgers* is the overlap of participants. In this case, the government alleges that the same two defendants were involved in all aspects of the scheme. Although Sullivan's involvement was apparently small in comparison to Maker's, if the government is able to prove its allegation that she aided and abetted Maker in pursuit of the scheme, *see, e.g.,* Appendix at 74A, her lack of participation in all aspects of the scheme does not necessarily establish her lack of culpability as to the entire scheme.[40] Thus, this case does not raise the concerns we had in *Camiel,* where the government's alleged single scheme involved two different, antagonistic schemers over two different time periods. Our concern in *Camiel*—that one group of defendants would be prejudiced by the introduction of evidence of incidents that took place when a completely different group of individuals was allegedly pursuing the same scheme—simply is not implicated in this case.

The fact that the second accident in the present case was neither planned nor intended from the outset does not alter our analysis of whether one or multiple schemes are involved. We conclude that, because the fraudulent conduct and purpose are consistent in regard to claims arising from the different accidents, and the identities of the participants are identical, the government has properly alleged one scheme to defraud. Because each of the three elements of a single scheme to defraud are stated by the government's allegations against Maker and Sullivan, there is no variance in this case. Accordingly the district court erred in dismissing the indictment as one based on more than one independent scheme to defraud.[41]

## V. *SEVERANCE OF THE TRIALS*

██ Maker argues that we have no jurisdiction to decide the questions relating to the severance of the charges and of the defendants, since the notice of appeal referred only to the order dismissing the indictment. See Brief for Appellee Robert James Maker at 12–14. As the following discussion will demonstrate, the issues raised by the district court's decision to sever the trial are intertwined with those raised by the dismissal of the indictment; therefore, we deem those questions to be properly raised by the notice of appeal.

██ The district court's decisions to sever the trial of the counts stemmed from its conclusion that the indictment charged two schemes rather than one. *See supra* pages 619–620. As we have explained, this conclusion was in error. The government has indicted the defendants for a single scheme to defraud, and it is entitled, absent some cause, to a single trial in which to demonstrate that the single scheme existed and that all of the counts were related to that single scheme. *See* Fed.R.Crim.P. 8(a); *Breeland v. United States,* 396 F.2d 805 (5th Cir.), *cert. denied,* 393 U.S. 847, 89 S.Ct. 132, 21 L.Ed.2d 117 (1968). Given our rejection of the district court's conclusion that the indictment was based on two schemes rather than one, and in the absence of any other "cause" for

---

**39.** *Cf. United States v. Pearlstein,* 576 F.2d 531, 535 (3d Cir.1978) (use of aliases is itself circumstantial evidence of conscious deception).

**40.** As we discuss below, severance of the trials is the proper method of preventing Sullivan, whose involvement in the scheme was relatively minor, from being prejudiced by having all of the evidence against Maker introduced against her.

**41.** Because we conclude that there was no variance, we need not consider whether some substantial right of the defendants was prejudiced by its existence. *See United States v. Fischbach and Moore, Inc.,* 750 F.2d 1183, 1190 (3d Cir.1984).

severing the trials on the different counts, we conclude that the district court abused its discretion in ordering severance.

■ The government next contends that the district court erred when it severed the trial as to the codefendants. Specifically, the government argues that the district court committed legal error in concluding that in a separate trial Sullivan would have been able to cross-examine Maker about statements made by him in the course of the earlier civil proceedings. The government contends that Maker could properly invoke the privilege against self-incrimination in a subsequent trial involving Sullivan, even if Maker had already been convicted. Additionally, the government contends that, because the statements by Maker would not be introduced during Sullivan's trial to prove the truth of his assertions, the statements would not be hearsay; therefore, Maker's availability for cross-examination should not have been relevant to a determination of whether Sullivan should be granted a separate trial. We do not resolve these issues because we conclude that the district court acted well within its discretion in deciding to sever the trial of the defendants. *See United States v. Reicherter,* 647 F.2d 397, 400 (3d Cir.1981).

Sullivan's involvement in the alleged scheme was limited. She made a statement in support of Maker's claim against Royal Globe for household services for the period between April 1976 and August 1977, *see* Appendix at 267A, 298A, and she allowed her tax return for 1976 to be submitted to Royal Globe in support of that claim. *See id.* at 301A. Maker allegedly worked as a boilermaker for the last four months of that period, under a different name, *see supra* pages 619–620, and Sullivan stated that she lived in his apartment during that period. *See* Appendix at 277–78A, 298A. There is nothing in the indictment, however, that indicates that Sullivan participated in the subsequent incidents involving the claims against State Farm and Erie, which constitute the bulk of the allegedly fraudulent claims, and evidence that Maker worked and continued to receive benefits during the period after August 1977 is only tangentially relevant to the question whether Sullivan fraudulently testified that Maker was incapacitated before August 1977. It is at least likely that much of the evidence against Maker would not be admissible against Sullivan, and that prejudice could result from the jury hearing that evidence. Under these circumstances, we conclude that the district court did not abuse its discretion when it severed the trials of the defendants. *See Bernitsky v. United States,* 620 F.2d 948, 950 (3d Cir.) ("[W]e are free to affirm the district court on any basis which finds support in the record."), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980).

We do not hold that a decision to try the defendants together would be an abuse of discretion, only that the severance decision was within the court's discretion. Accordingly, the prosecution may, if it chooses, raise this issue again before the district court.

## IV. *CONCLUSION*

In sum, we conclude that (1) this appeal is not barred by the double jeopardy clause of the fifth amendment; (2) the district court erred in dismissing the indictment, because a conviction based on a single scheme indictment could be supported by the facts the government intended to prove during the trial; (3) the district court's decision to sever the trial as to the counts arising from the separate accidents constituted an abuse of discretion because it was based on the court's erroneous conclusion that the indictment actually alleged two separate schemes to defraud; and (4) the court did not abuse its discretion in ordering separate trials for each defendant.

The judgment of the district court will be reversed, and the case remanded for further proceedings consistent with this opinion.